# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **PALLADIUM BOOKS, INC.,** | ) | |
| a Michigan corporation, | ) | Case No. 10-11859 |
| Plaintiff, | ) | Hon. Julian Abele Cook, Jr. |
| | ) | Magistrate Judge Paul J. Komives |
| **v.** | ) | |
| | ) | |
| **TRION WORLDS, INC.,** | ) | |
| a Delaware corporation, and | ) | |
| **TRION WORLD NETWORK, INC.,** | ) | |
| a Delaware corporation, | ) | |
| Defendants. | ) | |

## SPECIAL APPEARANCE BY DEFENDANT TRION WORLDS, INC. FOR THE PURPOSE OF OPPOSING THE MOTION FOR PRELIMINARY INJUNCTION

SD\717254.3

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   FACTS ...................................................................................................................2

    A.   Trion Worlds and Its Rift: Planes of Telara Game .....................................2
    B.   Palladium Books and Its RIFTS Mark and Products ...................................3
    C.   Palladium Books' Questionable Rights in the RIFTS Mark .........................4
    D.   This Lawsuit and Motion ............................................................................5

III.  ARGUMENT ........................................................................................................6

    A.   This Court Should Deny the Motion Because It Does Not Have Jurisdiction
        Over Trion Worlds in Michigan ..................................................................6
    B.   Standard for Preliminary Injunction ...........................................................7
        1.   Standard for Injunctive Relief ...........................................................7
    C.   Palladium Books Is Unlikely to Prevail on the Merits of Its Trademark
        Infringement Claim Because It Has Limited Trademark Rights and There
        Is No Likelihood of Confusion ....................................................................8
        1.   Palladium Books Has Very Limited Protectable Trademark Rights,
            and Its Federal Registrations Are Subject to Cancellation ..................8
        2.   Palladium Books Has Failed to Demonstrate That Confusion Is
            Likely ...........................................................................................10
            (a)   Both Companies Use Prominently Featured House Marks ...........11
            (b)   The RIFTS Mark Is Weak and Diluted .......................................11
            (c)   The Marks Are Dissimilar ..........................................................15
            (d)   Users of Online MMO Games Are Sophisticated .........................18
            (e)   Trion Worlds' MMO Game Is Different From Palladium's
                Books ........................................................................................19
            (f)   Trion Worlds Had No Intention of Trading on Palladium
                Books' Alleged Goodwill ...........................................................21
            (g)   Palladium Books' "Evidence" of Actual Confusion is
                Actually Evidence of a <u>Lack</u> of Confusion ...............................22
            (h)   Palladium Books' Claims of Imminent Expansion Into
                MMO Games Is Highly Suspect and Unsupported .......................23
            (i)   Marketing Channels ...................................................................24
    D.   Palladium Books Is Unlikely to Suffer Irreparable Harm and the Balance of
        Equities Thus Favors Trion Worlds ...........................................................24
    E.   Public Interest Would Not Be Served as There Is No Likelihood of
        Confusion ..................................................................................................26
    F.   A Substantial Bond Is Necessary and Appropriate as a Prerequisite to Any
        Injunctive Relief ........................................................................................26

IV.   CONCLUSION ...................................................................................................27

i

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Audi AG v. D'Amato,*
469 F.3d 534 (6th Cir. 2006) ...............................................................................8, 25

*AutoZone, Inc. v. Tandy Corp.,*
373 F.3d 786 (6th Cir. 2004) ...............................................................................11, 21

*Bird v. Parsons,*
289 F.3d 865 (6th Cir. 2002) ...............................................................................6

*Cooper Indus., Inc. v. U.S. E.P.A.,*
775 F. Supp. 1027 (W.D. Mich. 1991) ...............................................................6

*Daddy's Junky Music Stores v. Big Daddy's Family Music Ctr.,*
109 F.3d 275 (6th Cir. 1997) ...............................................................................16

*Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18,*
471 F.2d 872 (6th Cir. 1972) ...............................................................................7

*eBay, Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006).............................................................................................25

*Frisch's Rests. v. Elby's Big Boy,*
670 F.2d 642 (6th Cir. 1982) ...............................................................................11

*Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.,*
931 F.2d 1100 (6th Cir. 1991) .............................................................................11, 12, 18, 22

*In re MBNA Am. Bank, N.A.,*
340 F. 3d 1328 (Fed. Cir. 2003)...........................................................................12

*Jet, Inc. v. Sewage Aeration Sys.,*
165 F.3d 419 (6th Cir. 1999) ...............................................................................15, 16

*Jimdi, Inc. v. Twin Bay Docs and Prods., Inc.,*
501 F. Supp. 2d 993 (W.D. Mich. 2007) .............................................................26

*Leary v. Daeschner,*
228 F.3d 729 (6th Cir. 2000) ...............................................................................7

*Little Caesar Enters., Inc. v. Pizza Caesar, Inc.,*
834 F.2d 568 (6th Cir. 1987) ...............................................................................11, 15, 16

ii

*Natural Footwear, Ltd. v. Hart, Schaffner & Marx*,
    760 F.2d 1383 (3d Cir. 1985)................................................................8

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
    No. 10-cv-1464(CM), 2010 WL 808885 (S.D.N.Y. Mar. 9, 2010)........................25

*Roth v. Bank of Commw.*,
    583 F.2d 527 (6th Cir. 1978) ...............................................................26

*Safer, Inc. v. OMS Invs., Inc.*,
    No. 911764452010, TTAB LEXIS 51 (T.T.A.B. Feb. 23, 2010).......................14

*Salinger v. Colting*,
    No. 09-2878-cv, 2010 WL 1729126 (2d Cir. Apr. 30, 2010)........................25

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998)...........................................................................6

*Taubman v. Webfeats*,
    319 F.3d 770 (6th Cir. 2003) ...............................................................18

*Therma-Scan, Inc. v. Thermoscan, Inc.*,
    295 F.3d 623 (6th Cir. 2002) ...............................................................11

*Universal City Studios, Inc. v. Nintendo Co.*,
    746 F.2d 112 (2d Cir. 1984)................................................................20

*Urbain v. Knapp Bros. Mfg. Co.*,
    217 F.2d 810 (6th Cir. 1954) ...............................................................26

*Winter v. Natural Res. Def. Council*,
    129 S. Ct. 365 (2008).....................................................................7, 25

*Wynn Oil Co. v. Am. Way Serv. Corp.*,
    943 F.2d 595 (6th Cir. 1991) ...............................................................14

## STATUTES

15 U.S.C. § 1051(a)(2)........................................................................8

15 U.S.C. § 1051(a)(3)(C) ....................................................................8

15 U.S.C. § 1058(b)............................................................................9

15 U.S.C. § 1064(3)............................................................................9

15 U.S.C. § 1065(3)............................................................................9

iii

## OTHER AUTHORITIES

2 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 11:69 (2010).........12

2 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 23:15 (1984).........16

2 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition § 23:9</u> .....................22

5-5 Jerome Gilson, <u>Gilson on Trademarks</u> § 5.10 (2010)............................................................11

## RULES

Fed. R. Civ. P. 12(b) ...................................................................................................6

Fed. R. Civ. P. 65......................................................................................................26

Fed. R. Civ. P. 65(c) ............................................................................................26, 27

SD\717254.3

## STATEMENT OF ISSUES PRESENTED

Whether this court has jurisdiction to even consider the merits of Plaintiff's motion for preliminary injunction before ruling on Trion Worlds' motion to dismiss for lack of personal jurisdiction?

**Defendant Trion Worlds Answers: No**

Whether Plaintiff has demonstrated that it is entitled to the extraordinary relief of a preliminary injunction by showing that it will suffer irreparable injury despite the fact that the only event identified by Plaintiff in its motion is an upcoming industry-only trade show in Los Angeles where no products will be offered for sale?

**Defendant Trion Worlds Answers: No**

Whether this Court should refuse to grant the extraordinary injunctive relief Plaintiff seeks in its motion because Plaintiff has failed to demonstrate a strong likelihood of success on the merits, failed to demonstrate that it will suffer an irreparable injury (much less that any injury is imminent), failed to demonstrate that an injunction will not cause substantial harm to others, and failed to demonstrate that an injunction would be in the public interest?

**Defendant Trion Worlds Answers: Yes**

In the event that this Court determines that it has jurisdiction and that the extraordinary relief Plaintiff seeks is warranted, whether this Court should require a substantial bond pursuant to Fed. R. Civ. P. 65 to pay the concrete, demonstrable costs and damages that will be sustained by Trion Worlds if it is later found to have been wrongfully enjoined?

**Defendant Trion Worlds Answers: Yes**

SD\717254.3

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

<u>Whether This Court Must Rule on Jurisdictional Issues Before Considering the Merits</u>

1. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)

2. *Bird v. Parsons*, 289 F.3d 865 (6th Cir. 2002)

<u>Whether Plaintiff is Entitled to the Injunctive Relief</u>

1. Fed. R. Civ. P. 65

2. *Leary v. Daeschner*, 228 F.3d 729 (6th Cir. 2000)

3. *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365 (2008)

4. *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18*, 471 F.2d 872 (6th Cir. 1972)

5. *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)

6. *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568 (6th Cir. 1987)

7. *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100 (6th Cir. 1991)

8. *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419 (6th Cir. 1999)

9. *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786 (6th Cir. 2004)

10. *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616 (6th Cir. 2003)

<u>In the Event That Injunctive Relief is Granted, Whether This Court Should Require a Bond</u>

1. Fed. R. Civ. P. 65

2. *Urbain v. Knapp Bros. Mfg. Co.*, 217 F.2d 810 (6th Cir. 1954)

3. *Roth v. Bank of Commw.*, 583 F.2d 527 (6th Cir. 1978)

SD\717254.3

## I.   INTRODUCTION

Even though it filed its original complaint almost a month ago and nothing of consequence has changed since then, plaintiff Palladium Books, Inc. ("Palladium Books") asks this Court to hear and decide on an expedited basis a motion for injunctive relief against defendant Trion Worlds, Inc.[1] ("Trion Worlds").  Palladium Books has known for months about the E3 trade show beginning on June 15th.[2]  This delay alone demonstrates lack of irreparable injury and mandates denial of the motion.  By waiting for a month and only now seeking relief on an expedited basis, Palladium Books seeks to severely harm Trion Worlds and limit Trion Worlds' opportunity to investigate and respond to its claims.  Even so, Trion Worlds has identified several fatal problems with the motion for injunctive relief (the "Motion"):

- This Court does not have personal jurisdiction over Trion Worlds, and thus cannot order the relief that Palladium Books seeks.  Trion Worlds filed a motion to dismiss and, pursuant to controlling case law, asks the Court to decide that motion before ruling on Palladium Books' Motion.

- It is highly unlikely that Palladium Books can establish the requisite likelihood of consumer confusion because the parties each make very prominent use of their distinctive company names and primary house marks – "Palladium Books" **Palladium Books** and "Trion Worlds" ▮▮▮▮▮▮.

- The marks at issue – aside from always being used in connection with the very different and distinctive company names and marks shown above – are descriptive secondary

---

[1] Palladium Books sued Trion World Network, Inc. and Trion Worlds, Inc.  They are the same: Trion World Network changed its name to Trion Worlds on April 16, 2010.  Dunne Decl. ¶ 2.

[2] Indeed, Palladium Books admitted in its complaint that it knew of Trion Worlds' attendance at the E3 trade show in 2009.  Compl. at ¶ 23.

1

marks that describe the plot and theme of the book or game (like war or warfare for
military books and games) and thus are weak and entitled to little protection.

- There are over 1,000 third party uses of the term "Rift" or "Rifts" on books, movies, TV
  shows, and video games, including over 25 books alone in the sci-fi/fantasy category.

- Trion Worlds uses a different descriptive secondary mark in a different market where
  sophisticated people will not be confused.

- Palladium Books does not have valid trademark rights in the relevant video game market,
  and therefore cannot demonstrate that it is entitled to extraordinary provisional relief.

- Trion Worlds is filing petitions to cancel Palladium Books' trademark registrations for
  fraud on the United States Patent and Trademark Office ("USPTO").  Palladium Books
  cannot seek injunctive relief based on these registrations and has made no showing of any
  common law trademark rights.

- Palladium Books' Motion relies on unauthenticated and selectively quoted excerpts from
  unknown internet sources to support the claim for relief.

- Palladium Books' case is likely to become weaker as Trion Worlds is allowed to obtain
  discovery to refute Palladium Books' presently uncorroborated claims.

Accordingly, the Motion should be denied.

## II.    FACTS

### A.    <u>Trion Worlds and Its Rift: Planes of Telara Game</u>

Trion Worlds is a cutting edge developer of connected video games.  Dunne Decl. ¶ 3.
Formed in 2006, Trion Worlds is currently developing three server-based MMO games, including
its highly-anticipated "Rift: Planes of Telara" fantasy game (the "R:PoT Game").  *Id.*  The game
is still under development, and is not yet operational.  *Id.*  The R:PoT Game will involve
thousands of participants interacting and playing online.  *Id.*

The R:PoT Game was first unveiled in June 2009 at the E3 industry-only trade show under the name "Heroes of Telara." *Id.* ¶ 4. Trion Worlds then continued to develop the technology and content of the game and to adopt a new name that better communicated its feel and origin story. *Id.* In late 2009, Trion Worlds decided on "Rift: Planes of Telara," as that name appropriately captured the theme and storyline of the game, which involves a rich medieval world with swordplay, dragons, and magic, that is being torn apart by mysterious dimensional rifts. *Id.* Trion Worlds launched the official website for the R:PoT Game on April 26, 2010, amidst much media fanfare. *Id.* ¶ 5. The website clearly marks every page with Trion Worlds' distinctive house mark, , and clearly indicates that the company is located in California. Ex. 1. The website contains screenshots, concept art, short videos, descriptions of the game's storyline and characters, and user forums. Dunne Decl. ¶ 5. Trion Worlds also intends to feature its R:PoT Game at the upcoming industry-only trade show E3, to be held in mid-June in Los Angeles, and has invested substantial amounts of money in preparing for that show. *Id.* ¶ 7. Trion Worlds' exhibitor space will feature not only the R:PoT Game but also some of Trion Worlds' other games. *Id.* Trion has spent over $500,000 in unrecoverable costs in launching the R:PoT Game and preparing for E3. *Id.*

### B.   Palladium Books and Its RIFTS Mark and Products

Palladium Books publishes books about various "pen and paper" role-playing games, which all take place in the same "Megaverse" and follow the same set of master rules. Ex. 2. According to its website, Palladium Books released a book entitled "Rifts" in 1990. *Id.* The cover of the book included the phrase "Palladium Books presents:" preceding the title. Ex. 3. The title "Rifts" describes a key premise of the story: "The Earth we once knew is gone. It has joined the larger fraternity of magical worlds in the Megaverse® connected to countless alien

3

worlds and dimensions via the Rifts and realities cross into one another." Ex. 4. Over the next few years, Palladium Books introduced other "Rifts" books which included the same Palladium Books house mark and sometimes included a subtitle located beneath the term "Rifts":

 

As time has gone on, Palladium Books' games have become less relevant, and appear to have waned in popularity and commercial success (the main RIFTS book has only sold 250,000 copies in over 20 years on the market; 45,000 of those were in its first year). Ex. 2. Even its fans bemoan the lack of originality in the RIFTS materials and unwieldy set of rules. Ex. 5. The RIFTS books had a brief period of renewed excitement in 2003 when it was announced that Walt Disney Studios had optioned the books for a potential movie, but nothing has come of that relationship during the ensuing seven years. Exs. 2, 6. Indeed, in 2006, Palladium Books acknowledged, "The Rifts movie? Stalled." Ex. 6 at 2. Palladium Books has similarly failed to break into the video game market. Indeed, its owner characterized the video game joint venture with Nokia in 2005 as "stillborn." *Id.*

**C.    Palladium Books' Questionable Rights in the RIFTS Mark**

In the First Amended Verified Complaint ("FAVC") and Motion, Palladium Books claims expansive rights in the RIFTS mark covering a variety of goods, in particular for video games. *See* FAVC ¶ 16; Motion at 1-2. These rights, however, are illusory, and were obtained fraudulently. Palladium Books' federal registrations suffer from the following fatal defects:

- The registration for video games (No. 2,045,806) claims a first use date of May 1995, and continuous use since that date. Fossum Decl. ¶¶ 4, 8. Palladium Books admitted on its website, however, that the video game (which is not even a video game, but instead just a

4

basic utility software program) was "created…back in 1995. The software made it to the market but **only lasted a few months before it was pulled due to bugs.**" Exs. 7, 24 at 4 (emphasis added).  Trion Worlds intends to file a petition to cancel this registration.

- The registration for movies and television shows (No. 3,036,181) claims a first use date of October 14, 2005, but the RIFTS mark has never been used on a movie or TV show. Fossum Decl. ¶¶ 9, 12.  Indeed, Palladium Books admits that no movie has been released or is in production – one is only "anticipated" to "go into production next year."  FAVC ¶ 13; Motion at 15.  Trion Worlds intends to file a petition to cancel this registration.

- The PROMISE OF POWER registration (No. 3,213,944) does not even contain the word RIFTS, contrary to Palladium Books' suggestion in the FAVC (¶ 20) that it owns a registration for the mark "Rifts: Promise of Power" for computer games.  Fossum Decl. ¶ 14.  According to Palladium Books, the Promise of Power game was "stillborn," and "Finding it anywhere . . . required an act of God." Ex. 6.  Trion Worlds intends to seek cancellation of this registration.

### D.    This Lawsuit and Motion

Without any prior notice, Palladium Books filed a lawsuit in the Eastern District of Michigan on May 7, 2010 for trademark infringement and related claims.  Palladium Books then amended its verified complaint on May 27, 2010.  After the filing of the initial Complaint, Trion Worlds did not make any significant marketing launches or other special efforts for the R:PoT Game.  Yet three weeks later, on May 28th, Palladium Books filed a motion seeking a emergency relief and/or expedited hearing of its Motion.

5

### III.   ARGUMENT

#### A.   This Court Should Deny the Motion Because It Does Not Have Jurisdiction Over Trion Worlds in Michigan

As a threshold matter, this Court must first determine whether it has personal jurisdiction over Trion Worlds before it can address the merits of the case, including issuing injunctive relief. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (holding that "[t]he requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception" and that "[w]ithout jurisdiction the court cannot proceed at all in any cause") (quotations omitted); *Bird v. Parsons*, 289 F.3d 865, 872 (6th Cir. 2002) ("Although it is tempting to avoid addressing Bird's novel theory of personal jurisdiction by assuming, without deciding, that . . . defendants are subject to personal jurisdiction . . . and proceed directly to the substantive claims that Bird asserts [failure to state a claim], the Supreme Court has . . . foreclosed this possibility.") (citing *Steel*, 523 U.S. at 93-95); *see also Cooper Indus., Inc. v. U.S. E.P.A.*, 775 F. Supp. 1027, 1036 (W.D. Mich. 1991) ("This Court may not grant a preliminary injunction if it lacks jurisdiction over the claim before it. Therefore, I must decide the jurisdictional question before evaluating plaintiff's request for injunctive relief, as the latter issue is moot if this Court is without jurisdiction.").

Trion Worlds filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b) on May 31, 2010 showing, among other things, that the Court lacks personal jurisdiction over Trion Worlds. Dkt. No. 13. Trion Worlds respectfully submits that the Court should rule on the jurisdictional issue first and address the instant Motion only if it finds jurisdiction. However, should the Court determine that it has personal jurisdiction over Trion Worlds, venue in this District is proper, and no convenience transfer is warranted, then Trion Worlds asks the Court to deny the Motion in its entirety for the reasons set forth below.

6

**B.**     **Standard for Preliminary Injunction**

1.     Standard for Injunctive Relief

In deciding a motion for preliminary injunction, the Court must balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (quotation omitted). These four factors "are to be balanced against one another." *Id.* While the first two factors normally are considered the most important, the United States Supreme Court has held that in deciding motions for injunctive relief, courts still "must balance the competing claims of injury" and "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 377-78 (2008) (quotations omitted).

Palladium Books dramatically understates the heavy burden it carries to obtain injunctive relief. A preliminary injunction "is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." *Leary*, 228 F.3d at 739 (citations omitted); *see also Winter*, 129 S. Ct. at 376 (preliminary injunction is an "extraordinary remedy"). "There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing [of] an injunction." *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18*, 471 F.2d 872, 876 (6th Cir. 1972) (quotation omitted). The proof required for a plaintiff to obtain injunctive relief "is much more stringent than the proof required to survive a summary judgment motion." *Leary*, 228 F.3d at 739. Thus, given these requirements, Palladium Books cannot establish the need for injunctive relief.

7

**C.**   **Palladium Books Is Unlikely to Prevail on the Merits of Its Trademark Infringement Claim Because It Has Limited Trademark Rights and There Is No Likelihood of Confusion**

1.   Palladium Books Has Very Limited Protectable Trademark Rights, and Its Federal Registrations Are Subject to Cancellation

The threshold inquiry in every trademark case is whether the plaintiff possesses valid, enforceable rights in a protectable mark. A valid mark must function to identify the source of particular goods to consumers. *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006). Accordingly, trademark rights must be based on bona fide use in commerce on specific goods. *Natural Footwear, Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1395 (3d Cir. 1985). Sporadic or de minimis use in commerce is not sufficient to establish trademark rights, and if such use is not continuous, those rights are subject to abandonment. *Id.* at 1400. Trademark rights are also territorial such that the rights may be limited to a particular state or even city. *Id.* at 1398-99.

To establish common law trademark rights, Palladium Books was required to submit evidence of its use in commerce of its alleged marks, including evidence of the dates, location, and volume of its sales, the nature of the goods bearing each mark, and other evidence sufficient to demonstrate that its use of the mark on particular goods is not sporadic or de minimis and that it has not been abandoned through non-use. *Id.* Palladium Books has submitted nothing to substantiate its claim to common law rights, and as described below, there are serious questions regarding validity of any of Palladium Books' claimed trademark rights. Without providing evidence, Palladium Books should not be allowed to rely on its common law rights to obtain relief, particularly when Trion Worlds has not yet had the opportunity to obtain discovery.

The validity of Palladium Books' trademark registrations also depends on its ability to demonstrate use in commerce of those marks on the goods described in each registration. 15 U.S.C. §§ 1051(a)(2), (a)(3)(C). In its applications and subsequent declarations of use necessary

8

to maintain and renew the registrations, Palladium Books was required to make sworn statements to the USPTO that attest to current – and in some cases five years of continuous – use in commerce on the goods described. *Id.*; *see also* 15 U.S.C. §§ 1058(b), 1065(3). Each of Palladium Books' federally registered marks is subject to cancellation at any time if it is determined that Palladium Books made any misrepresentations during prosecution or maintenance of the registration. 15 U.S.C. § 1064(3). Even based on the limited evidence that Trion Worlds has been able to uncover at this early stage of the case without discovery, it appears that Palladium Books vastly overstates the scope of any trademark rights that it holds, and a number of its registrations are subject to cancellation for fraudulent statements.

In particular, for the RIFTS registration on computer games, Trion Worlds has been unable to identify any use by Palladium Books of RIFTS on computer games sufficient to support the representations made in declarations to the USPTO. The "RIFTS Game Master Companion" originally identified by Palladium Books as the basis for its registration was, according to Palladium Books' own website, pulled from the market before the application was even filed and, even if it were not, it does not fit the description of the goods adopted by Palladium Books. Fossum Decl. ¶ 4; Ex. 7. Further, in 2003, Palladium Books submitted a specimen of a *book* rather than a computer game when renewing the registration, and there does not appear to be any use of RIFTS on computer games that could support its sworn statement that it had used the mark in commerce continuously for the prior five years on computer games. Fossum Decl. ¶ 8; Ex. 3.

For the RIFTS registration on motion pictures, television programs, videotapes, and DVDs, it similarly appears that Palladium Books has not used the mark in commerce on *any* of the described goods. Palladium Books' ITU application was clearly originally filed in connection with the Walt Disney Studios deal, but, by Palladium Books' own admission, that movie never

9

materialized.  Fossum Decl. ¶¶ 9-11.  So instead Palladium Books submitted something that it described as an "animated motion picture trailer" as the specimen.  *Id.* ¶ 12.  Setting aside the fact that a trailer is not a motion picture, television program, videotape or DVD, Trion Worlds has been unable to locate any evidence of any motion picture (animated or otherwise) being released by Palladium Books or a licensee, and on that basis, believes Palladium Books' statement of use to be a misrepresentation.

The PROMISE OF POWER registration raises similar questions regarding the sufficiency of use in commerce of the mark.  Fossum Decl. ¶¶ 14-15.  Given Palladium Books' statement that "[t]he truly wonderful Rifts® videogame – Rifts® Promise of Power – *was stillborn.* The N-Gage platform never took off in North America. That meant the N-Gage and Rifts® *Promise of Power would NOT be available on the mass market in the USA* and Canada. *Finding it anywhere in North America required an act of God,*" it is unclear how a statement of use citing that game as a specimen could be anything other than a misrepresentation.  Ex. 6 (emphasis added).

Consequently, if Palladium Books has any trademark rights for consideration in its Motion, they should be limited to the RIFTS mark for books (Reg. No. 2,889,353), which is still vulnerable to a descriptiveness challenge.  Moreover, that registration is simply for the plain block mark RIFTS – not other formulations or extensions, nor is the registration for goods or services on "various media" including computer games or movies.

        2.    <u>Palladium Books Has Failed to Demonstrate That Confusion Is Likely</u>

In order to prevail on a claim of trademark infringement, a plaintiff must prove that there is a "likelihood of confusion" among consumers, which requires balancing eight factors: (1) strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.

10

*Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987) (citing

*Frisch's Rests. v. Elby's Big Boy*, 670 F.2d 642, 648 (6th Cir. 1982)). "[T]he ultimate question

[is] whether relevant consumers are likely to believe that the products . . . offered by the parties

are affiliated in some way." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d

1100, 1107 (6th Cir. 1991). Here, confusion is not likely for the following reasons:

### (a)    Both Companies Use Prominently Featured House Marks

Importantly, Palladium Books' RIFTS mark and Trion Worlds' "Rift: Planes of Telara"

name are both used in conjunction with prominent house marks, diminishing the similarity of the

marks. The Sixth Circuit has held that "[t]he use of a challenged junior mark together with a

house mark or house trade name can distinguish the challenged junior mark from the senior mark

and make confusion less likely." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 796 (6th Cir.

2004) (the use of "Powerzone" in connection with Radio Shack's house mark was not sufficiently

similar to plaintiff's "Autozone" mark). The RIFTS books conspicuously include either the

Palladium Books logo or the statement "Palladium Books Presents:" on the cover, and Trion

Worlds' website prominently features the bright red "Trion Worlds" logo. Since both parties use

their house marks in connection with their respective products, confusion is unlikely.

### (b)    The RIFTS Mark Is Weak and Diluted

The strength of a mark focuses on its distinctiveness and recognition among the public.

*Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 631 (6th Cir. 2002). "A mark's strength

differs from its position on the distinctiveness scale. Strength is a combination of the mark's

place on the distinctiveness scale and its degree of acquired distinctiveness, how well it is

recognized in the marketplace and how clearly it is actually associated with a particular source."

5-5 Jerome Gilson, Gilson on Trademarks § 5.10 (2010). Thus, even if a mark is on the strong

side of the scale, it may have little customer recognition or "strength" in the market, or perhaps

11

have recognition only in a particular product or market segment. *Homeowners*, 931 F.2d at 1107.

Moreover, courts have found extensive third party use of a trademark substantially weakens the

strength of the mark. *Id.*

      "Rifts" is a weak trademark, both in terms of its distinctiveness and recognition among the

public, due to its descriptive nature and extensive third party use. A mark is merely descriptive,

and thus relatively weak on the distinctiveness scale, if it immediately conveys some knowledge

of the characteristics of the product on which it is used. *In re MBNA Am. Bank, N.A.*, 340 F. 3d

1328, 1332 (Fed. Cir. 2003). Palladium Books admits that "[Rifts] merely refers to one of the

elements or themes of the Palladium games." Motion at 9. Indeed, "Rifts" describes a primary

element of the story in which Palladium Books' books are set: "The Earth we once knew is gone.

It has joined the larger fraternity of magical worlds in the Megaverse® connected to countless

alien worlds and dimensions via the Rifts and realities cross into one another." Ex. 4.

      Further, descriptive use of a term by other sellers of goods supports an inference of

descriptiveness. 2 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u>

§ 11:69 (2010) (hereinafter "<u>McCarthy</u>"). Extensive third-party use of "Rift" or "Rifts" further

evidences the descriptive nature of the mark as well as substantially weakening it as a trademark,

particularly in the science fiction or fantasy setting. A search of the books offered on

Amazon.com in the sci-fi/fantasy category (excluding books published by Palladium Books)

shows that there are over 25 books in that specific category employing "Rift" or "Rifts" in their

titles, including most notably <u>Rift</u> by Kay Kenyon; <u>The Rift</u> by Walter Jon Williams; <u>The Rift</u> by

Peter David; <u>Rift in the Sky</u> by Trevor Boddington; <u>Rift in the Sky: Stratification #3</u> by Julie

Czerneda; <u>Rifts of Time</u> by Graham Garner; and <u>Rifts Through Quentaris</u> by Karen Brooks. Exs.

8-9. In addition, two of the results of the search, <u>The Shadow Rift</u> by William Connors and

12

Fantastic Locations: The Frostfell Rift by Wizards Team, are books related to the Dungeons & Dragons role-playing game. *Id.* A search that is not limited to the sci-fi/fantasy category (but still excludes books published by Palladium Books) contains over 950 results employing "Rift" or "Rifts" in the titles. Ex. 10.

The term "Rift" or "Rifts" is also extensively used in movies, TV shows, and video games. The Internet Movie Database (*imdb.com*) contains entries for over 15 movies, videos, and shows, including most notably Rifts (2004); Rift (1993); Rift (2004); Rift (2007); Rift (2008); Rift (2009); The Rift (1990); The Rift (2002); and The Rift (2009). Ex. 11. Numerous computer games also employ the term "Rift" or "Rifts" such as Rift; Rift; R.I.F.T.; Tripping the Rift; Cosmic Rift;[3] Motorstorm: Pacific Rift; Dark Rift; Chasm: The Rift; Time Rift; Koronis Rift; and Final Fantasy Tactics A2: Grimoire of the Rift.[4] Exs. 12, 18-21.

Critically, the concept of "rifts" between worlds did not originate with Palladium Books, nor has it been limited to Palladium Books' books. For example, in 1982, Raymond E. Feist, a well-known science fiction and fantasy author, released a series of books known as "The Riftwar Saga." The back cover of the first book in the series summarizes the plot involving events that occur after "dark beings from another world had *opened a rift in the fabric of spacetime* to begin again the age-old battle between the forces of Order and Chaos." Ex. 13 (emphasis added). Rifts have also been a common theme in computer games, and even in MMO games, well before Trion Worlds began advertising the R:PoT Game. *See, e.g.*, Ex. 22 (describing the "Rift System" in the MMO game "Aion"); Ex. 23 (describing a play area called "The Rift" in the hugely successful

---

[3] Cosmic Rift is a registered trademark of Sony Online Entertainment (No. 2,887,418) for "entertainment services, namely, providing on-line computer games." *Available at* http://www.station.sony.com/casualProduct.vm?Id=038.

[4] Grimoire of the Rift is a registered trademark of Square Enix (No. 3,599,002).

massively multiplayer online game "World of Warcraft").[5]

Rather than submitting evidence concerning the actual strength of the RIFTS mark, Palladium Books instead attempts to rely on a procedural fiction that it contends is created by allegedly incontestable status. Motion at 10. This argument should be rejected because it is not in accord with the facts or the law. First, to the extent that Palladium Books is relying on common law trademark rights (*see, e.g.*, Motion at 2), the statutory concept of incontestability is inapplicable, and Palladium Books must produce evidence of secondary meaning or its descriptive mark is unprotectable. Second, Palladium Books' registrations for RIFTS on books or movies are not incontestable, and thus they are not entitled to any benefits accorded that status. Third, as discussed above, Palladium Books' only mark that has achieved incontestable status (No. 2,045,806) is subject to cancellation because of fraudulent misrepresentations made to the USPTO, including misrepresentations of continuous use made in Palladium Books' declaration of incontestability. Finally, the authority relied upon by Palladium Books has since been clarified to provide, at most, a presumption of an indicia of strength based on incontestability. *See Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 600 (6th Cir. 1991) (emphasizing the presumption language in the earlier *Wynn* case and noting that the strength of the Wynn mark had only been challenged on the basis that it was descriptive); *see also Safer, Inc. v. OMS Invs., Inc.*, No. 911764452010, TTAB LEXIS 51, at *12-13 (T.T.A.B. Feb. 23, 2010) ("the fact that [a] federally-registered trademark has achieved incontestable status . . . does not dictate that the mark is 'strong'"). Even if one of Palladium Books' marks were entitled to a presumption of strength based on incontestable status, the extensive third-party use demonstrated above should be

---

[5] A post by Palladium fans on its forum site further details the concepts in the Rifts books that are borrowed from movies that predate any Rifts book releases. *See* http://forums.palladium-megaverse.com/viewtopic.php?f=51&t=112344.

considered sufficient to demonstrate that the mark is weak.  Accordingly, this factor favors Trion
Worlds in the likelihood of confusion analysis.

### (c)   *The Marks Are Dissimilar*

Contrary to Palladium Books' assertions that its RIFTS mark and Trion Worlds' "Rift:
Planes of Telara" mark are "clearly" similar, Sixth Circuit courts have held that marks with even
greater similarity are not likely to confuse consumers.  Furthermore, Palladium Books' selective
citation of the leading trademark treatise, <u>McCarthy on Trademarks</u>, gives the misimpression that
a court should look only at the "dominant" part of a composite mark, and not the mark as a whole.
To the contrary, both <u>McCarthy</u> and the Sixth Circuit make clear that, while in some cases a
"dominant" part of a mark may be given some weight, courts are to analyze the similarity of
composite marks by looking at them *in their entirety*, and cannot split them up into component
parts.  *See Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 423 (6th Cir. 1999) ("Although
examination of the components of each mark may be helpful, the determination of similarity is
made on the basis of the marks in their entireties. We have endorsed the 'anti-dissection rule,'
which serves to remind courts not to focus only on the prominent features of the mark . . . but on
the mark in its totality.").

While it is true that both names include the word "rift," that alone is not enough to find
that the marks are similar.  Even when marks share the same "prominent" word and the parties
are in the same line of business, the Sixth Circuit has found that confusion was not likely.  *Little
Caesar*, 834 F.2d at 569-70.  In *Little Caesar*, the plaintiff operated a chain of pizza franchises
using the registered mark "Little Caesars," while the defendant operated a restaurant under the
name "Pizza Caesar USA."  *Id.*  The Sixth Circuit noted that the "similarity of the marks" factor
was "pivotal" and that both marks employed the word "Caesar" prominently in the mark.  *Id.* at
571-72.  Nevertheless, under the "anti-dissection" rule, a trademark "should not be split up into

15

its component parts and each part then compared with parts of the conflicting mark to determine the likelihood of confusion. It is the impression which the mark as a whole creates . . . and not the parts thereof which is important." *Id.* at 571 (quoting <u>McCarthy</u> § 23:15 (1984)).  The court went on to note that the word "Caesar" is frequently used in connection with Italian food—just as the concept of inter-dimensional "rifts" is a common theme in fantasy and science fiction.  *Id.* at 572. In addition, the court pointed out that "[t]he differences in sound and appearance between 'Little Caesar' and 'Pizza Caesar' are obvious, and the addition of the acronym 'USA' to the latter mark almost doubles the number of syllables and heightens the distinction." *Id.*  The court ultimately concluded that there was no infringement, despite the fact that "Little Caesar has a relatively strong mark, the products and services involved are similar, and the level of consumer care is low," because the two marks were "sufficiently distinct" to make confusion unlikely.  *Id.* Here, the marks at issue are even less similar than those in *Little Caesar*.  Just as there were "obvious" differences in sound, appearance, and syllables between "Little Caesar" and "Pizza Caesar USA," Palladium Books' RIFTS mark and Trion Worlds' "Rift: Planes of Telara" are quite distinct in sound, appearance, and syllables.

Palladium Books also argues that the addition of a colon and the "Planes of Telara" title "will do nothing to prevent confusion."  While courts have held that the addition of general, nondistinctive terms to a mark does not help to distinguish it, that is clearly not the case here. *Compare Daddy's Junky Music Stores v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 284 (6th Cir. 1997) ("'Family Music Store' is too general to contribute any distinguishing elements to the full name of defendant's store.") *with Jet*, 165 F.3d at 423-24 (adding the prefix "aerob-a" to the word "jet" made the defendant's "aerob-a-jet" product sufficiently dissimilar from plaintiff's "jet" product to avoid infringement, despite the fact that the goods were extremely similar and the

parties were in direct competition). The "Planes of Telara" portion of the mark used by Trion Worlds is unique, exotic and memorable, and provides a highly distinctive element to the mark.

In addition, Palladium Books' invitation to the court to construe its mark as "Rifts _____" should be declined. First, none of the asserted registrations claims that formulation of the RIFTS mark. Second, the assertion that Palladium Books has produced a "wide variety of games using the titular format of 'Rifts _____'" is misleading. Motion at 1. For example, the FAVC states that the "Rifts" mark is used in conjunction with the subtitle "Shemarrian Nation" in the format "Rifts _____." FAVC ¶ 8. However, the "Shemarrian Nation" book was not titled in that manner, nor were a number of other "Rifts" products.

 

As these examples demonstrate, even when the RIFTS mark is used with a connection in another title, the actual RIFTS mark does not always directly precede the other title, as Plaintiff implies, and oftentimes is even less prominent than Palladium Books' house mark.

Furthermore, it is common for fans of MMO games to refer to their favorite games with acronyms. For example, the leading MMO game, "World of Warcraft," is most often referred to as "WoW." Similarly, Palladium Books' own Motion reveals that MMO gamers have already

SD\717254.3

started to refer to the "Rift: Planes of Telara" game as "R:PoT" (Motion at 13), and will likely continue to do so. None of Palladium Books' products have the acronym "R:PoT," so it is likely that any similarity between the marks will *decrease* over time as more gamers adopt the "R:PoT" acronym in lieu of the full title. Nevertheless, even when taken as a whole, the "Rift: Planes of Telara" name is not sufficiently similar to the RIFTS mark to support a finding of infringement.

Finally, Trion Worlds has also added a disclaimer to its website to further distinguish its R:PoT Game from Palladium Books' products. Although Trion Worlds is confident that its game does not infringe any of Palladium Books' rights, out of an abundance of caution and to allay Palladium Books' concerns, on May 30, 2010, the following statement was added to the site: "Rift: Planes of Telara™ by Trion Worlds, Inc. is NOT related to or affiliated with Rifts® by Palladium Books, Inc." Ex. 1. The disclaimer includes a hyperlink to Palladium Books' website, so in the unlikely event that any user arrives at Trion Worlds' site in error, they can instantaneously and effortlessly be redirected to Palladium Books' website with a single click. In all likelihood, this disclaimer will actually serve as beneficial advertising for Palladium Books, since the vast majority of visitors to Trion Worlds' site will not be familiar with Palladium Books, but may click the link and visit Palladium Books' site out of curiosity. *See Taubman v. Webfeats*, 319 F. 3d 770, 777 (6th Cir. 2003) (use of a disclaimer actually serves to redirect lost customers).

### (d)   *Users of Online MMO Games Are Sophisticated*

"Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Homeowners*, 931 F.2d at 1111. When a buyer, however, "has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper. . . . When services are sold to such buyers, other things being equal, there is less likelihood of confusion." *Id.* Consumers of MMO games are extremely sophisticated and knowledgeable about them, and it is not uncommon for consumers to

18

commit hundreds or even thousands of hours per year playing to build their status in the online world. Given the considerable amount of time expended, consumers exercise a high degree of care in selecting which games they subscribe to. Entire websites are devoted to the topic (*see, e.g., mmorpg.com*) and gamers usually actively participate in forums and chatrooms to discuss games in detail. Accordingly, consumers exercising this degree of care and conducting this type of research before making a purchase are very unlikely to be confused that Palladium Books is the source of Trion Worlds' online game.

### (e)     *Trion Worlds' MMO Game Is Different From Palladium's Books*

In examining the relatedness of goods factor, the Sixth Circuit has held that "if the parties compete directly, confusion is likely if the marks are sufficiently similar; . . . if the goods and services are somewhat related, but not competitive, then the likelihood of confusion will turn on other factors; [and] if the products are unrelated, confusion is highly unlikely." *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003).

In its Motion, Palladium Books attempts to argue that its RIFTS books[6] and Trion Worlds' online game are closely related, primarily because both are "role playing games" that incorporate the common sci-fi/fantasy element of inter-dimensional "rifts" (a concept, of course, that long predates Palladium Books' use of the term). While this may appear important at first glance to someone who is unfamiliar with role-playing games and the sci-fi/fantasy field, it is similar to arguing that if a company produced ping-pong balls and had a trademark on the word "ball," that another company's production of basketballs should be enjoined because both

---

[6] Palladium Books' assertion that it has produced RIFTS products in the form of "computer games" is tenuous at best and misleading at worst. The only product that Palladium Books has *ever* produced that might qualify as an "computer game" is the "Promise of Power" cellphone game that by its own admission was "required an act of god" to find in North America. Ex. 6.

19

products relate to "games" that use "balls." The use of "rifts" in the world of sci-fi/fantasy is analogous to the use of "balls" in the world of sports, and Palladium Books' argument that its RIFTS books and Trion Worlds' R:PoT Game are somewhat "related" is as untenable as the "ball" hypothetical outlined above. *See, e.g., Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir. 1984) (holding *no* likelihood of confusion as a matter of law between the defendant's "Donkey Kong" video game and plaintiff's "King Kong" trademark related to movies even where both products involved "a gorilla, a captive woman, a male rescuer and a building scenario.").

The only "games" that Palladium Books has ever produced in any significant numbers are its series of "pen and paper" role-playing game books. These games are played by a small group of players sitting around a table, rolling dice, and talking about what their "characters" are doing. In sharp contrast, MMO games like the R:PoT Game are played online with a computer, feature advanced, realistic graphics, and involve the simultaneous interaction of thousands—or even millions—of players. For a comparison of the very different gaming experiences, please see Exhibit 14 (photos) and 15 (YouTube videos[7]). The contrast is striking, and demonstrates that even if both products could broadly be described as "role-playing games" that involve the ubiquitous storytelling element of inter-dimensional "rifts," they are only as "related" as ping-pong and basketball, both of which are "games" that involve the use of "balls,"

These products do not compete with each other, even if they may be played by the same type of consumer. One is not a substitute for the other. Thus, this factor does not support a finding of a likelihood of confusion.

---

In addition, Palladium Books' registration for computer games is subject to cancellation, as described above.

    *(f)*  ***Trion Worlds Had No Intention of Trading on Palladium Books'***
       ***Alleged Goodwill***

   Palladium Books' baseless accusations that Trion Worlds copied its mark and is

"knowingly and intentionally attempting to free-ride on the good will" of the RIFTS mark is

absolutely false.  Trion Worlds is developing a cutting-edge online game with eye-popping

graphics and the ability to simultaneously play along with thousands of other participants.  It has

been developing the game for four years, and has raised millions of dollars to fund these efforts.

Dunne Decl. ¶ 6.  Palladium Books, on the other hand, has an outdated pen and paper game that

might have been popular in the early 1990s, but no longer has much of a presence in the pen and

paper game market.  Ex. 16.  Palladium Books admitted on its website that it has only sold

250,000 of its main RIFTS book in the 20 years that it has been around (45,000 of which were

sold in the first year).  Ex. 2.  This adds up to just over 10,000 units per year after 1990.

Tellingly, Palladium Books' FAVC and Motion are complete devoid of any discussion of sales

volume, revenues, or profits.  This is because Palladium Books' brand is, sadly but truthfully, past

its prime and no longer successful.  *See, e.g.*, Ex. 17.  There is no reason that Trion Worlds would

want any association with Palladium Books.  To argue that Trion Worlds actually desired this

association, and sought it out by copying the RIFTS mark, is simply not supported by the

evidence and contrary to common sense.

   Palladium Books' attempt to characterize and convert knowledge into intent is also legally

unsupported.  The Sixth Circuit addressed the intent factor on similar facts in *AutoZone*, where

the defendant, Radio Shack, which had adopted the mark POWERZONE, admitted general

knowledge of plaintiff's AUTOZONE mark.  *AutoZone*, 373 F.3d at 799.  Radio Shack testified

---

[7] http://www.youtube.com/watch?v=gCOmuL4SaGU (RIFTS);
 http://www.youtube.com/watch?v=nyc12NsiteE (Rift: Planes of Telara).

that it adopted its mark anyway because it believed there was no infringement, and disavowed any intent to copy or trade off of Autozone's goodwill. *Id.* The court concluded that "AutoZone has not presented any evidence of bad intent." *Id.* at 800.

> ### (g)    *Palladium Books' "Evidence" of Actual Confusion is Actually Evidence of a <u>Lack</u> of Confusion*

The list of unauthenticated and misleadingly excerpted anonymous online comments included in the Motion to show confusion is in reality evidence that there has been no confusion. Instead, the comments cited are largely evidence of the fact that "Rift: Planes of Telara" was merely a "call to mind" that does not amount to actual confusion. *See* <u>McCarthy</u> § 23:9 ("'Confusion' means more than that the junior user's mark merely 'calls to mind' the senior user's mark."); *see also* <u>Homeowners</u>, 931 F.2d at 1110 ("Short-lived confusion . . . is worthy of little weight"). Palladium Books apparently attempted to obscure this fact through selective and misleading quotation, and by emphasizing portions of the quotations, without disclosing that it did so, but even a cursory review of Palladium Books' "evidence" shows that no actual confusion has occurred:

- *So this is the Rifts, the classic pen and paper rpg game, converted to an MMO? Interesting, not sure how you can fit it all in, Rifts was pretty epic in scale and number of factions."* <u>Less than an hour later, the same user posted this comment, which Palladium Books conspicuously failed to disclose to the Court in its Motion</u>: ***"Ignore my first comment its not Rifts judging by those screenshots.*** *Curses! Rifts the mmo would of been coolio."* (emphasis added). FAVC Ex. 18.

- <u>Palladium Books provided this excerpt to the Court</u>: *"RIFTS was the first thing I thought of too. . . ."* <u>but failed to disclose the post in its entirety, which reads</u>: *"RIFTS was the first thing I thought of too.* ***But so what? It's not the first time a name reminds us of another rpg product. And that's all it was – one name reminiscent of another."*** (emphasis added). FAVC Ex. 18.

- *"Yeah, I looked at this because I thought to myself, "Sweet Jeebus, it's about time Rifts made an MMO. . . . **And then I saw it, and I was like, damn another fantasy MMO clone.** How dull."* (emphasis added).

- *"Whoa, **for a minute** I thought they were making an MMO out of Rifts tabletop."* (emphasis added).

These quotes represent but a few of Palladium Books' numerous examples of selective

SD\717254.3

quotation that, in total, amount to a sadly transparent attempt to create evidence of actual confusion where none exists.  The posts above illustrate that, at most, when these individuals first heard of the R:PoT Game it "called to mind" Palladium Books' RIFTS books.  However, these quotes also provide ample evidence that the individuals *almost instantly realized* that the R:PoT Game is not associated with Palladium Books.

Palladium Books also tries to argue that "once the game is actually launched . . . the likelihood of confusion will be exponentially greater."  Motion at 14.  To the contrary, if there was to be any confusion (which there clearly was not), it would come *soon after the game was announced*, before gamers became aware of the content of the game and who produced it.  As Palladium Books' own "evidence" demonstrates, when the game title was announced— approximately a year before the game is due to be released—within "a minute" of looking at a preview of the game users were able to tell that it was not associated with Palladium Books.  As "Rift: Planes of Telara" gains more widespread recognition, it will become even clearer to the gaming public that it is not associated with Palladium Books. Consequently, Palladium Books has failed to establish actual confusion, and any miniscule amount of "confusion" that may occur is likely to dramatically decrease over time.

> **(h)     *Palladium Books' Claims of Imminent Expansion Into MMO Games Is Highly Suspect and Unsupported***

Palladium Books argues repeatedly in its Motion that it intends to expand into the MMO game market, and "has been in negotiation for such a game this year with two major producers of such games."  Motion at 3.  There was no mention, however, of any such desire or negotiations to expand into the MMO market in the initial Complaint filed only a few weeks ago, nor was there any mention of these alleged negotiations on the Palladium Books website, that is until that website was suddenly revamped on May 19th, only a few days before this Motion was filed.

23

*Compare* Ex. 2 *with* Ex. 4. It appears a little too convenient that Palladium Books now has intense negotiations and detailed expansion plans that suddenly appeared just in time to be included in its Motion. The Court should look with suspicion on these claims, and if the Court is inclined to credit them, Trion Worlds requests the opportunity to seek discovery before a ruling on the Motion. Such uncorroborated claims, appearing shortly before the filing of this motion, should not be relied upon to support an injunction.

### (i) *Marketing Channels*

Palladium Books claims that it "use[s] the internet as a, if not the, primary marketing and promotional tool." Motion at 15. That claim is not borne out by the facts, however, since Palladium Books had not updated or revised its webpage for the RIFTS products *in over five years* (that is, until it updated the page a few days before filing its Motion to add claims that support its current arguments). Ex. 2. Palladium Books' main page about its company, Palladium Books, is even older, with its last update *over nine years ago*. *Id.* at 18. Clearly Palladium Books does not consider the internet to be even an ancillary, much less a primary, marketing tool for its RIFTS products, so this factor weighs against a likelihood of confusion.

### D. Palladium Books Is Unlikely to Suffer Irreparable Harm and the Balance of Equities Thus Favors Trion Worlds

Palladium Books has not shown irreparable harm. First, Trion Worlds has not even sold anything yet. Thus, Palladium Books cannot argue diverted or lost sales, and the "potential difficulty of proof of plaintiff's damages," *see* Motion at 20, is not present, since Palladium Books' financial damages are easy to compute: zero. Second, there is no plausible argument that Palladium Books' reputation and goodwill, such as they are, would be somehow harmed by a mistaken association with Trion Worlds. The premise of Palladium Books' injury to goodwill argument is that "the most corrosive and irreparable harm attributable to trademark infringement

24

is the inability of the victim to control the nature and quality of the defendant's goods," but that theory of injury is simply inapplicable because there are no goods available for consumers to purchase.[8]  Moreover, there is extensive third party use of this descriptive terms "Rift" or "Rifts," and Palladium Books cannot show that Trion Worlds' entry into this crowded field with a distinguishable descriptive use of the word "Rift" will cause irreparable harm.

Palladium Books, citing a single, unpublished case, argues that in trademark infringement cases, where a likelihood of success on the merits has been proven – which it has not been here – the Court need not consider any of the remaining three traditional injunctive relief factors. Motion at 20.  The Supreme Court's decisions in *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) and *Winter* foreclose this argument, expressly rejecting any categorical presumption that a plaintiff in certain types of cases will always suffer irreparable harm upon the showing of a likelihood of success on the merits.  *See, e.g., eBay*, 547 U.S. at 391, 393-94.  As the Court stated in *eBay*, "traditional equitable principles do not permit such broad classifications." *Id.* at 393. Rather, courts actually must consider the remaining three factors, including considering the injury the plaintiff will suffer if it loses on the injunction but prevails on the merits.  *Id.* at 391.[9] Accordingly, Palladium Books has not, and cannot, show any irreparable injury in this case.

Similarly, Palladium Books cannot credibly argue that the balance of harms is in its favor.

---

[8] Moreover, Palladium Books has nowhere alleged that Trion Worlds' products will be inferior or low-quality, nor could it, as Trion Worlds is developing advanced, cutting-edge technology to be used in a rich and complex online gaming experience.

[9] The *eBay* or *Winter* holdings are not limited to their facts.  Courts in this Circuit and elsewhere have broadly applied those holdings that all four traditional injunction factors must always be considered, and can never be presumed, to all types of cases, including trademark cases.  *See, e.g., Salinger v. Colting*, No. 09-2878-cv, 2010 WL 1729126, at *7 (2d Cir. Apr. 30, 2010) ("nothing in the text or the logic of *eBay* suggests that its rule is limited to patent cases. On the contrary, *eBay* strongly indicates that the traditional principles of equity . . . are the presumptive standard for injunctions in any context."); *New York City Triathlon, LLC v. NYC Triathlon Club,*

25

It has no financial damages, and there is no harm to its reputation (indeed, there may actually be a benefit). On the other hand, Trion Worlds is faced with losing the significant investments it has made in the R:PoT Game, all of which were incurred prior to the filing of this lawsuit. Accordingly, the balance of equities here clearly favors Trion Worlds.

### E.    Public Interest Would Not Be Served as There Is No Likelihood of Confusion

As detailed above, there is no likelihood of confusion given the differences in the marks and the sophistication of the gamer community. Accordingly, issuing a preliminary injunction would be against the public interest. *See, e.g., Jimdi, Inc. v. Twin Bay Docs and Prods., Inc.*, 501 F. Supp. 2d 993, 1010 (W.D. Mich. 2007) (it is not in the public's interest to grant an injunction where the chance of confusion is insignificant).

### F.    A Substantial Bond Is Necessary and Appropriate as a Prerequisite to Any Injunctive Relief

The Court should require a substantial bond before any injunction becomes effective. Rule 65 provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). While requiring a bond is left to the District Court's discretion, the Sixth Circuit has indicated that not requiring a bond is only appropriate where it "appear[s] that no material damage will ensue to [the defendant] from the failure of the District Judge to require [a] bond." *Urbain v. Knapp Bros. Mfg. Co.*, 217 F.2d 810, 816 (6th Cir. 1954); *see also Roth v. Bank of Commw.*, 583 F.2d 527, 538-39 (6th Cir. 1978) (holding that it was error to fail to expressly consider the question of requiring a bond).

Here, Palladium Books cannot dispute that Trion Worlds will suffer extensive costs and damages if enjoined, both due to sums already expended in marketing and promoting its

---

*Inc.*, No. 10-cv-1464(CM), 2010 WL 808885, at *17 (S.D.N.Y. Mar. 9, 2010) (applying *eBay*

upcoming online gaming service and future losses that will be incurred.  For example, Trion

Worlds has invested over $730,000 to promote "Rift: Planes of Telara" at the upcoming trade-

only E3 Expo on June 15, 2010.  Dunne Decl. ¶ 7 (itemizing the expenditures).  A significant

portion of these expenditures are tied directly to the name "Rift: Planes of Telara" (e.g., a custom

fabricated booth prominently featuring the name) such that enjoining Trion Worlds will cause

immediate and concrete damage by depriving it of the value of these unrecoverable expenditures.

*Id.*  Trion Worlds will also suffer future damages, either as a result of being prohibited from

engaging in marketing and advertising its chosen name entirely or having to start anew, incurring

additional substantial expenses to select another name, which are estimated to be at least

$50,000.00.  *Id.* ¶ 8.

Trion Worlds is entitled to compensation if it is determined that it was wrongfully

enjoined.  Security is especially critical here because Palladium Books may have very few, if any,

assets from which Trion Worlds could be made whole if wrongfully enjoined.  Ex. 6.

Accordingly, Trion Worlds respectfully requests that Palladium Books be required to post a bond

of at least $550,000, pursuant to Rule 65(c), before any injunction becomes effective.

## IV.    CONCLUSION

For the foregoing reasons, Trion Worlds requests that the Court deny the Motion.

> HONIGMAN MILLER SCHWARTZ AND COHN LLP
> /s/ Nicholas B. Gorga
> Nicholas B. Gorga (P72297)
> Attorney for Specially Appearing Trion Worlds, Inc.
> 2290 First National Building
> 660 Woodward Avenue
> Detroit, MI 48226
> (313) 465-7000

Dated:  June 3, 2010        ngorga@honigman.com

---

and *Salinger* in trademark case); *Audi*, 469 F.3d at 550 (applying *eBay* in trademark case).

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 3, 2010, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system.

s/ Nicholas B. Gorga
_____
Nicholas B. Gorga (P72297)
HONIGMAN MILLER SCHWARTZ & COHN LLP
Attorneys for Specially Appearing Trion Worlds, Inc.
2290 First National Building
660 Woodward Avenue
Detroit, Michigan  48226
(313) 465-7000
ngorga@honigman.com